IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| DAVID KENNETH WINTERS,<br>On Behalf of David L. Winters, Deceased, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil No. 11-690-CJP |
| MICHAEL J. ASTRUE,<br>Commissioner of Social Security, | ) ) ) | |
| Defendant. | ) ) | |

## MEMORANDUM and ORDER

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff David Kenneth Winters is before the Court, represented by counsel, seeking review of the final decision of the Commissioner of Social Security denying the application of David L. Winters for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI).[1]

## Procedural History

Plaintiff David Kenneth Winters is the surviving son of David L. Winters. References to "Mr. Winters" or to "claimant" herein shall be taken as references to David L. Winters.

Claimant David L. Winters applied for benefits in August, 2006, alleging disability beginning on June 13, 2005. (Tr. 153, 159). His application was denied initially and on reconsideration. ALJ Joseph W. Warzycki held a hearing on November 5, 2008. (Tr. 2773).

David L. Winters passed away on December 22, 2008, due to nonischemic (dilated)

---

[1] This case was referred to the undersigned for final disposition upon consent of the parties, pursuant to 28 U.S.C. §636(c). See, Doc. 14.

1

cardiomyopathy and acute renal failure. (Tr. 193). The ALJ denied the application for benefits in a decision dated August 18, 2009. (Tr. 12-19). Plaintiff's attorney filed a request for review by the Appeals Council. (Tr. 24).

The Appeals Council dismissed the request for review as to the SSI claim because the children of a deceased claimant are not eligible to receive SSI payments. 20 C.F.R. §§416.542(b) & 416.1471(b). The dismissal of a request for review by the Appeal Council is a not subject to judicial review. 20 C.F.R. §416.1472.

The Appeals Council denied the request for review as to the denial of DIB. Therefore, the decision of the ALJ became the final agency decision as to that issue. (Tr. 4-7). Administrative remedies have been exhausted and a timely complaint was filed in this Court.

## Issues Raised by Plaintiff

Plaintiff argues that the ALJ erred in the following respects:

1. He erred in determining that claimant did not meet or equal the requirements of Listing 4.02, Chronic Heart Failure.

2. He failed to consider whether claimant met or equaled Listing 6.02, Impairment of Renal Function.

3. He failed to consider the impairments of spondylosis, gout and renal failure.

4. The ALJ's assessment of claimant's residual functional capacity was not supported by substantial evidence and was inconsistent with the hypothetical question posed to the vocational expert.

## Applicable Legal Standards

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes. For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous

period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. §423(d)(3). "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. 20 C.F.R. § 404.1572.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. It must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. ***Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992); see also, 20 C.F.R. §§ 404.1520(b-f).**

The Seventh Circuit Court of Appeals has explained the five-step inquiry as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

***Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).**

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. The scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." **42 U.S.C. § 405(g)**. Thus, this Court must determine not whether Mr. Winters was, in fact, disabled, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. **See, Books v. Chater, 91 F.3d 972, 977-78 (7th Cir. 1996)** (citing *Diaz v. Chater*, **55 F.3d 300, 306 (7th Cir. 1995)**). This Court uses the Supreme Court's definition of substantial evidence, i.e, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." ***Richardson v. Perales*, 402 U.S. 389, 401 (1971).**

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. ***Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997)**. However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, ***Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.**

### The Decision of the ALJ

ALJ Warzycki followed the five-step analytical framework described above. He determined that Mr. Winters had not been engaged in substantial gainful activity since the alleged onset date, and that he had severe impairments of congestive heart failure and hypertension. He determined that these impairments do not meet or equal a listed impairment. The ALJ found that Mr. Winters had the residual functional capacity to perform a limited range of work at the light exertional level. Based on the testimony of a vocational expert ("VE"), the

ALJ concluded that Mr. Winters could have performed his past relevant work of assistant manager of a retail store and apartment manager as they are generally performed. He also concluded that, if he were further limited to simple, repetitive work, Mr. Winters could have performed other jobs such as file clerk and food services technician. The VE testified that these jobs exist in significant numbers in the national and local economy.

### The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff.

**1.    Agency Forms**

Mr. Winters was born in 1970, and was 35 years old when he allegedly became disabled on June 13, 2005. (Tr. 204). He was insured for DIB at the time of his death on December 22, 2008. (Tr. 188).

Claimant had a college degree. (Tr. 216). He had worked as a counselor in a juvenile lockdown facility, an assistant manager in a retail store, an assistant housing director at a university, and several other jobs. (Tr. 210). He did not complete a Work History Report form as requested by the agency. (Tr. 218).

Mr. Winters stated that he was unable to work due to congestive heart failure and heart attack. (Tr. 209). In an Activities of Daily Living Questionnaire, he indicated that he had no problems using his arms or hands except that he could not lift over 25 pounds and reaching overhead sometimes made him faint. He said he was short of breath "24/7," could only climb 4 or 5 steps and could not walk or stand for a long time. He said he was unable to cook, shop, or do chores, and he often slept most of the day. (Tr. 229-236).

**2.    Evidentiary Hearing**

Claimant was represented by an attorney at the evidentiary hearing on November 5, 2008.  (Tr. 27).

Mr. Winters was then 38 years old.  He was 5'9" and weighed 235 or 240 pounds.  (Tr. 31-32).  He was staying with a friend.  The utilities at his apartment had been cut off because he could not pay the bills.  (Tr. 32).

In June, 2005, claimant was hospitalized for congestive heart failure.  A pacemaker and a defibrillator were implanted.  (Tr. 37).  He said that he also had gout, which caused his hand and leg to be stiff sometimes.  (Tr. 57).

Mr. Winters testified that he sat around most of the day.  (Tr. 44).  He could not do a lot of walking.  (Tr. 45).   He took medication for high blood pressure, which controlled it.  (Tr. 52).  He took a number of medications for his heart.  (Tr. 53).  He said that the side effects of his medications were "real bad."  (Tr. 54).  He could not sleep at night and felt jumpy.  He had to urinate often due to the diuretic he takes.  (Tr. 59).

Mr. Winters said that he had no problem sitting, but could only stand for 20 to 30 minutes.  He could not lift hardly any weight.  He could not bend, stoop, crouch, kneel or crawl because he would be short of breath.  (Tr. 62).

Brenda Young  testified as a vocational expert.  The ALJ asked her to assume a person who could do light work (lift 20 pounds occasionally and 10 pounds frequently, sit/stand/walk each for 6 out of 8 hours), with no ladders, ropes or scaffolds and only occasional climbing, balancing, stooping, crouching, kneeling or crawling.  The VE testified that this person could do claimant's past work of housing manager and retail store manager as they are generally performed.  (Tr. 67-69).

The ALJ then added a limitation to simple, repetitive work. The VE testified that this eliminated his past work, but he could do other jobs such as file clerk and food service helper, as well as other sedentary jobs. (Tr. 69-70).

The ALJ noted that Mr. Winters had failed to appear for two scheduled consultative examinations, and then his attorney wrote to the agency that claimant desired that the case be decided on the evidence in the record. (Tr. 48-49). Mr. Winters denied telling his attorney that. (Tr. 49). At the end of the hearing, the ALJ said that he would schedule additional examinations. (Tr. 71-72). Mr. Winters died on December 22, 2008, before those examinations took place. (Tr. 193).

3. **Medical Records**

Mr. Winters had a pacemaker and defibrillator implanted on June 27, 2005, by a doctor in Maryland. (Tr. 284). He was seen by another doctor in Maryland on September 15, 2005. This doctor noted that Mr. Winters had left ventricular ejection fraction of 17% before implantation of the pacemaker and defibrillator, but his chronic heart failure was "completely compensated" after treatment. The doctor noted that he had, at one point in the past, been considered a heart transplant candidate, but he had "improved remarkably." A stress thallium test was planned to rule out progression of his coronary disease and to evaluate his current ejection fraction. (Tr. 270-272). There is no indication that the stress test was done at that time.

Claimant was evidently living in Tennessee in early 2006. He went to the emergency room at the University of Tennessee Medical Center in January, 2006, complaining of increasing shortness of breath. According to the history and physical note, he had not been taking his medications on a regular basis because they made him "feel funny" and he was "concerned about his erectile dysfunction." It was noted that he had a history of binge drinking. He reported that

he was working at a gas station. When the doctor entered the room, he was discussing what kind of alcohol he could have. He was counseled that he could not drink alcohol at all. The impression was congestive heart failure. The plan was to adjust his medications, do an echocardiogram to confirm his ejection fraction and do a set of cardiac enzymes. (Tr. 313-314). He was admitted to the hospital and given Lasix (a diuretic) which decreased his shortness of breath. The dosage was reduced when his creatinine increased. His ejection fraction was 15-20%. It was noted that he had "mild acute renal insufficiency most likely secondary to diuresis with IV Lasix." The plan was to modify his medications upon discharge, but he signed out against medical advice before the discharge orders were written. (Tr. 311-312).

Claimant was treated by East Tennessee Heart Consultants. His pacemaker was reprogrammed in April, 2006. (Tr. 441). Thereafter, on April 18, 2006, the doctor noted that he was doing better. He denied chest pain or shortness of breath. The impression was dilated cardiomyopathy, status post ICD implantation, and erectile dysfunction. (Tr. 439). In June, 2006, he was having shortness of breath and some edema, so the pacemaker was again reprogrammed. (Tr. 438).

Mr. Winters came back to Illinois in 2007. He went to the emergency room at Memorial Hospital in Belleville, Illinois, on November 9, 2007, complaining of shortness of breath. He also had edema in both legs. He was admitted and treated with Lasix and potassium. He was described as cooperative and "very manipulative." (Tr. 590-592). Dr. Abdul-Aziz saw claimant for a cardiology consult on the same day. Dr. Aziz noted that his diuretics had been recently changed and he had noticed increasing build-up of fluid. He was short of breath but denied any chest pain. On exam, his abdomen was distended from fluid retention and he had +2 edema in both legs. (Tr. 594-595). Claimant was discharged in improved condition on November 11,

2007. The discharge diagnoses were congestive heart failure, alcoholic cardiomyopathy, and medication noncompliance. The discharge summary states that he was "put back on his medications" and did well. (Tr. 581).

Claimant was again admitted to Memorial Hospital through the emergency room on March 7, 2008. He went to the emergency room with complaints of chest pain on and off for the past several weeks. He had moved back to the area in the last month. (Tr. 795). Dr. Aziz wrote a consult note in which he noted that claimant had stopped taking his medications 10 to 14 days ago. On exam, he had no jugular venous pressure. He had occasional crackles in his lungs. His abdomen was distended "secondary to fluid retention." He had no edema in his extremities. (Tr. 690-691; 796-797). The Discharge Summary noted that he had not yet been to see a doctor in the area. His medications were resumed in the hospital and he was put on IV Lasix. He subsequently had "excellent diuresis" and "no further pain or discomfort from the volume overload." His blood pressure was good. An echocardiogram showed ejection fraction of 20 to 25%. He was noted to have mild renal insufficiency with a baseline creatinine of 1.3 to 1.5. He was discharged on March 10, 2008, and was to follow up with a cardiac doctor at Barnes Hospital in St. Louis, Missouri. (Tr. 675-678).

Claimant had a similar admission to Memorial Hospital after presenting in the emergency room at Touchette Hospital on June 17, 2008. He again had shortness of breath after failing to take his medications. Dr. Mahmood's discharge summary notes that Mr. Winters had rales and some lower extremity edema. He was treated with diuretics and potassium. He was discharged on June 21, 2008. At that time, his congestive heart failure was compensated. He was told to follow up with Dr. Aziz in a week. (Tr. 843-844). In a history and physical note dated June 17, 2008, Dr. Aziz noted that he had elevated jugular venous pressure, occasional crackles in his

9

lungs, distended abdomen and trace edema in the extremities. He had gained 5 to 10 pounds in the past several days. (Tr. 849). A consult note on the same date states that Mr. Winters did not take his medications "in between hospitalizations because he cannot afford to buy any of them." (Tr. 851).

Mr. Winters was seen by Dr. Edward Geltman, a cardiologist at Washington University School of Medicine in St. Louis, Missouri, on July 1, 2008. Dr. Geltman noted his history of implantation of pacemaker and defibrillator. He further noted that claimant had been unable to get his medications, and had been in and out of the hospital with decompensated heart failure. However, he had recently "gained funding" and was able to get his medications. Since he had been taking his medications, he had been "relatively healthy." He was able to walk several blocks without shortness of breath and was able to climb multiple flights of steps. He had no chest pain, palpitations or lower extremity swelling. Dr. Geltman noted that his most recent testing showed ejection fraction of 25% to 30%. The plan was to continue his medications, add Lisinopril,[2] and draw routine lab studies for baselines. He was to return in one month. (Tr. 968-969).

On August 3, 2008, Mr. Winters went to the emergency room at Memorial after his defibrillator shocked him 4 times. He was not having any other symptoms. It was noted that he had renal insufficiency and was at his baseline renal function. (Tr. 982-983). On the intake examination, he had no jugular venous distension, and no leg edema. Chest x-rays showed an enlarged heart and pulmonary congestion. He was admitted to the hospital. (Tr. 564-566). A history and physical note dated August 3, 2008, states that he had no basilar rales, no abdominal

---

[2]Lisinopril is an ACE inhibitor which is used to treat high blood pressure and heart failure. See, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000917, accessed on May 24, 2012.

distention and no enlargement of his liver or spleen. (Tr. 569). Dr. Mahmood went to his room and counseled him that he needed to follow-up with regard to his cardiac condition. However, claimant "became quite aggressive." Dr. Mahmood told him he would not treat him any more. (Tr. 567). The settings on his pacemaker were adjusted. (Tr. 570).

On September 14, 2008, claimant went to the emergency room for pain in his buttock radiating into his leg. (Tr. 925). A lumbar spine x-ray showed spondylolysis of L5 with spondylolisthesis of L5 with respect to L5 and S1. It was otherwise unremarkable. (Tr. 982). He was given pain medication and told to follow up with a doctor. (Tr. 929).

Claimant went to the emergency room for pain and swelling in his left leg on October 2, 2008. He told staff there that his doctor had told him it was a build-up of uric acid and he had a history of gout. (Tr. 1037). A Doppler study showed no deep vein thrombosis. (Tr. 1042). He was given pain medication and discharged. (Tr. 1039). He was again seen in the emergency room for leg and arm pain related to gout on October 19, 2008. (Tr. 1081-1083).

### 4.     Physical RFC Assessment

A state agency physician completed a Physical RFC Assessment on September 27, 2006. He determined that claimant was capable of light work, i.e., he could frequently lift 10 pounds, occasionally lift 20 pounds, stand and/or walk 6 out of 8 hours and sit for 6 out of 8 hours. His ability to push and/or pull with upper extremities and operate foot controls was unlimited. He had some postural limitations, including never using ladders, ropes or scaffolds, and only occasionally climbing stairs, stooping or kneeling. He had no manipulative or environmental limitations. (Tr. 450-457).

A second state agency physician reviewed the record and agreed with this assessment on April 30, 2007. (Tr. 536-538).

## Analysis

Plaintiff first argues that the ALJ erred in concluding that Mr. Winters did not meet or equal the requirements of Listing 4.02.

A finding that a claimant's condition meets or equals a listed impairment is a finding that the claimant is presumptively disabled. In order to be found presumptively disabled, the claimant must meet *all* of the criteria in the listing; an impairment "cannot meet the criteria of a listing based only on a diagnosis." 20 C.F.R. §404.1525(d). The claimant bears the burden of proving that he meets or equals a listed impairment. **Maggard v. Apfel, 167 F.3d 376, 380 (7th Cir. 1999).**

Listing 4.02 sets out the requirements to be found presumptively disabled due to chronic heart failure. The first paragraph of Listing 4.02 refers to chronic heart failure "while on a regimen of prescribed treatment" with symptoms and signs described in 4.00D2, and states that the claimant must satisfy the requirements of *both* parts A and B.

The requirements of part A of Listing 4.02 are:

> **A.** Medically documented presence of one of the following:
>
> 1. Systolic failure (see 4.00D1a(I)), with left ventricular end diastolic dimensions greater than 6.0 cm or ejection fraction of 30 percent or less during a period of stability (not during an episode of acute heart failure); or
>
> 2. Diastolic failure (see 4.00D1a(ii)), with left ventricular posterior wall plus septal thickness totaling 2.5 cm or greater on imaging, with an enlarged left atrium greater than or equal to 4.5 cm, with normal or elevated ejection fraction during a period of stability (not during an episode of acute heart failure).

Plaintiff argues that claimant met the requirements of the first paragraph in that his testing showed an ejection fraction of less than 30%. Defendant does not dispute that assertion. Rather, he argues that claimant does not meet part B.

Part B requires that the claimant meet the requirements of one of three scenarios. Plaintiff argues that claimant met B(2), which requires:

> 2. Three or more separate episodes of acute congestive heart failure within a consecutive 12 month period (see 4.00A3e), with evidence of fluid retention (see 4.00D2b (ii)) from clinical and imaging assessments at the time of the episodes, requiring acute extended physician intervention such as hospitalization or emergency room treatment for 12 hours or more, separated by periods of stabilization (see 4.00D4c).

Plaintiff points out that Mr. Winters did, in fact, have nine heart-related emergency room visits within a year, and that four of those visits required at least overnight hospitalizations. He argues that the ALJ did not explain why those visits do not satisfy B(2). See, Doc. 21, p. 5. However, plaintiff ignores the rest of the requirements of B(2). He does not even attempt to demonstrate that the record contains the required evidence of fluid retention as described in paragraph 4.00D2b. Further, he makes no attempt to show that the record contains the required evidence of periods of stabilization as described in paragraph 4.00D4c.

According to paragraph 4.00D4c, a period of stabilization must be at least two weeks long, and there must be "objective evidence of clearing of the pulmonary edema or pleural effusions and evidence that you returned to, or you were medically considered able to return to, your prior level of activity." The record in this case contains no such evidence of the required periods of stabilization between episodes of acute congestive heart failure.

Plaintiff next argues that the ALJ should have considered whether claimant met the requirements of Listing 6.02. That Listing is for impairment of renal function due to chronic renal disease that has lasted or can be expected to last for a continuous period of at least twelve months. Plaintiff's only attempt to show that Mr. Winters met this Listing is to point out that the records from the University of Tennessee Medical Center contain a diagnosis of renal

13

insufficiency. Those medical records actually indicate that he had "mild acute renal insufficiency most likely secondary to diuresis with IV Lasix." (Tr. 311-312). He was not, in fact, diagnosed with chronic renal disease as required by the Listing. Further, the Listing requires more than a diagnosis; it requires evidence of either chronic dialysis, kidney transplant, or persistent elevation of serum creatinine to 4 mg per dL, with additional findings. Mr. Winters did not undergo dialysis or a kidney transplant, and his creatinine levels never approached 4.

The ALJ is not required to discuss a Listing where there is no evidence the Listing was met. **Scheck v. Barnhart, 357 F.3d 697, 700 (7th Cir. 2004)**. As there is no evidence that Mr. Winters met Listing 6.02, the ALJ did not err in failing to discuss same.

Plaintiff's third argument is similarly undeveloped. He suggests that the ALJ erred in not considering whether Mr. Winters met the requirements of the Listings for disorders of the spine and immune system disorders, based on his diagnoses of spondylosis/spondylolisthesis and gout. However, a claimant cannot meet the requirements of a Listing based on a diagnosis alone. 20 C.F.R. §404.1525(d). Again, as plaintiff does not address the criteria of the respective Listings, his argument must fail.

Lastly, plaintiff argues that the ALJ erred in that he added a limitation regarding excessive walking and heavy lifting to his RFC assessment, but did not ask the VE to assume this limitation in his hypothetical question.

This argument is based upon a misunderstanding of the ALJ's decision. The ALJ accepted the state agency consultants' opinions and determined that Mr. Winters had the RFC to do light work with some postural limitations. (Tr. 15). The hypothetical question to the VE included all of the limitations that were included in the RFC assessment. (Tr. 68-69).

The opinions of the state agency consultants provided substantial evidence to support the

ALJ's RFC assessment. "State agency medical and psychological consultants are highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the Act." SSR 96-6p, at 2. The ALJ is required by 20 C.F.R. §§ 404.1527(f) and 416.927(f) to consider the state agency physicians' findings of fact about the nature and severity of the claimant's impairment as opinions of non-examining physicians; while the ALJ is not bound by the opinion, he may not ignore it either, but must consider it and explain the weight given to the opinion in his decision. Notably, plaintiff does not argue that the ALJ's assessment of claimant's RFC was not supported by substantial evidence.

The ALJ found that Mr. Winters had the RFC to do his past jobs of retail store manager and apartment manager as they are generally performed in the economy. Plaintiff focuses on the ALJ's observation that Mr. Winters' past work as a retail store manager and an apartment manager do not require heavy lifting or excessive walking. (Tr. 18). Plaintiff argues that it is "not clear" how the ALJ reached this conclusion. However, it is clear: the VE testified that both these jobs are classified as light as they are generally performed. (Tr. 68-69). By definition, "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing . . . ." 20 C.F.R. §404.1567(b). While the phrase "excessive walking" is imprecise, it is clear that the ALJ meant that these two jobs do not require walking in excess of the requirements of light work.

In any event, even if the ALJ was less than clear with regard to the requirements of Mr. Winters' past work, he went on to make an alternative finding that Mr. Winters was able to do other work which exists in significant numbers in the regional economy. Plaintiff has not raised any argument with respect to that finding. Therefore, any error with respect to claimant's past

15

work was harmless.

## Conclusion

After careful review of the record as a whole, the Court finds that the ALJ committed no errors of law, and that the findings of the ALJ are supported by substantial evidence.

The final decision of the Commissioner of Social Security denying the application of David L. Winters for Disability Insurance Benefits is **AFFIRMED.**

**The Clerk of Court is directed to enter judgment in favor of defendant.**

**IT IS SO ORDERED.**

**DATED: May 24, 2012.**

**s/ Clifford J. Proud**
**CLIFFORD J. PROUD**
**UNITED STATES MAGISTRATE JUDGE**